DeMOSS, Circuit Judge:
This appeal stems from a final order of Respondent Occupational Safety and Health Review Commission (the “Commission”), which vacated in part citations issued by Petitioner-Cross-Respondent Elaine Chao, Secretary of Labor (the “Secretary”), against Respondents-Cross-Petitioners Eric K. Ho (“Ho”), et al. (together, “Ho Respondents”). For the following reasons, we DENY the petitions for review and AFFIRM the decision of the Commission.
BACKGROUND
The penalties assessed by the Secretary and mostly affirmed by the Administrative Law Judge (“ALJ”) and the Commission against Ho for various violations of the Occupational Safety and Health Act, 29 U.S.C. §§ 651-678 (“OSH Act”), and associated safety and health regulations all concern his behavior as proprietor of a worksite where workers were exposed to asbestos in the course of a project to reno *360 vate a building. On October 27, 1997, Ho individually purchased a defunct hospital and medical- office building in Houston to develop the property as residential housing. Ho knew there was asbestos onsite. He was also aware that any alteration to asbestos-containing materials was to be handled by personnel licensed and registered with the Texas Department of Health (“TDH”). Ho instead hired Manuel Escobedo (“Escobedo”) and Corston Tate (“Tate”), whose work he had previously used, to do the renovations. Escobe-do hired 11 Mexican nationals, who were illegal immigrants, to assist. Renovations, including the removal of asbestos, started in January 1998.
At most, the workers were occasionally given dust masks not suitable for protection against asbestos. They were not issued protective clothing. Ho also did not provide a respiratory protection program, conduct medical surveillance, conduct asbestos monitoring, implement adequate ventilation or debris removal, inform the workers of the presence and hazards of asbestos, or provide any training whatsoever. There is no dispute that Ho was aware of the worksite conditions; he visited almost every day.
On February 2, 1998, a city inspector visited the worksite. After observing the conditions, he issued a stop-work order citing the possibility of exposure to asbestos, requiring that city approval be given before work could resume. Ho then began negotiating with a licensed contractor, Alamo Environmental (“Alamo”), to remove the asbestos. Alamo prepared an abatement estimate in accordance with Occupational Safety and Health Administration (“OSHA”), amongst other federal, guidelines. On March 27, 1998, Ho notified Alamo by fax that he agreed to their proposal.
However, during this period of negotiation, Ho had resumed work at the site under the same conditions, except that he directed all work be performed at night. The workers ate, and some lived, at the site. The workers had no potable water and only one portable toilet. Tate sometimes allowed workers to leave the property to use the restroom at a nearby commercial establishment; and Tate would purchase and bring back food for the workers when they gave him money. Ho continued to visit the worksite and was aware of these conditions.
Asbestos removal continued in this fashion until March 10, 1998. On March 11, 1998, as Ho had directed, daytime work resumed at the site. Ho had been informed that either the sprinkler system or fire hydrant valves had not been turned off and thus remained available for use. To wash out the building, Ho directed Tate to tap into an unmarked valve believed to be a water line. It turned out to be a gas line. An explosion later occurred when Tate started his truck; it injured Tate and two workers. On March 12, 1998, workers were summoned to Ho’s office where they were given releases to sign, acknowledging receipt of $1000 as full payment for their work, and acknowledging receipt of $100 to release Ho from any claims that might arise from the explosion and fire. The releases were written in English, but an interpreter translated them for the workers.
After the explosion, TDH conducted an investigation. Samples of debris and the ambient air at the worksite showed levels of asbestos in excess of federal and state standards. The state notified Ho that the site remained unsafe and needed to be sealed by qualified personnel. Again, Ho used the same workers to install plywood over the windows and did not give them any protective equipment.
. OSHA also conducted an investigation. As a result, the Secretary issued a total of *361 10 serious and 29 willful violations against Ho Respondents; these charges included 11 willful violations of 29 C.F.R. § 1926.1101(h)(l)(i) for failing to provide respirators to 11 employees removing asbestos and 11 willful violations of 29 C.F.R. § 1926.1101(k)(9)(i) and (viii) for failing to train the 11 employees on the hazards of asbestos and safety precautions. The Secretary also charged Ho Respondents with willfully violating the OSH Act’s general duty clause, 29 U.S.C. § 654(a)(1), by ordering Tate to tap into the unmarked pipeline. Ho was also convicted of criminal violations of the Clean Air Act (“CAA”). This Court upheld his conviction. United States v. Ho, 311 F.3d 589, 611 (5th Cir.2002).
Ho conceded before the ALJ that he violated the asbestos respirator and training standards. Ho argued that he was not subject to the OSH Act’s requirements because he was not engaged in a business affecting interstate commerce and that the corporate Ho Respondents should be dismissed because they were not employers of the employees engaged in asbestos removal. He also challenged the per-employee citations of the respirator and training violations. Finally, Ho contended he did not violate the general duty clause of the OSH Act, or if he had violated it, that such violation was not willful.
The ALJ ruled that Ho’s construction activities affected interstate commerce and Ho was liable for the OSH Act violations. He also found the corporate Ho Respondents liable as alter egos of Ho and under the “sham to perpetuate a fraud” doctrine because Ho exercised control over both corporations and used them to obtain funds to purchase and renovate the property. The ALJ determined the respirator and training violations were willful and upheld all 22 violations. The ALJ found also that Ho had violated the general duty clause of the OSH Act but that it could not be characterized as a willful violation because the Secretary failed to show that Ho actually knew of the danger or had a heightened awareness of the illegality of his conduct.
On review, the Commission affirmed that Ho was subject to the OSH Act and that Ho’s violations of the respirator and training standards were willful. A divided Commission ruled that such violations were to be cited on a per-instance, not a per-employee, basis because it felt that the regulations plainly imposed a duty on employers to have a single training program and to provide respirators to the employees as a group. It thus vacated all but two of those citations. The Commission also concluded the record did not support the ALJ’s finding that the corporate Ho Respondents were liable because these entities’ primary business activities had nothing to do with the hospital renovation and they did not exist as mere business conduits for Ho’s own purposes.[1] The Commission affirmed the ALJ’s finding that the general duty violation committed by Ho was not willful. The Commission also increased all the citations affirmed to their maximum penalties because of Ho’s lack of good faith. The Secretary timely filed her petition for review, and the Ho Respondents timely filed their cross-petition.
DISCUSSION

Whether the Commission’s factual finding that Ho’s illegal asbestos abatement activities at the hospital worksite affected interstate commerce was supported by substantial evidence.

The OSH Act applies to employers, defined as “person[s] engaged in a busi *362 ness affecting commerce who ha[ve] employees.” 29 U.S.C. § 652(5) (1970). By enacting the OSH Act, Congress intended to exercise the full extent of the authority granted by the Commerce Clause. Austin Road Co. v. OSHRC, 683 F.2d 905, 907 (5th Cir.1982). “Accordingly, an employer comes under the aegis of the [OSH] Act by merely affecting commerce; it is not necessary that the employer be engaged directly in interstate commerce.” Id. (citations omitted).
The Secretary bears “the burden of showing that the employer’s activities affect interstate commerce.” Id. at 907. This burden is “modest, if indeed not light.” Id. On appeal, this. Court only reviews the Commission’s findings of fact to ensure they are “supported by substantial evidence in the record considered as a whole.” Id. at 908; see also 29 U.S.C. § 660(a). Substantial evidence is “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” Consolo v. Fed. Mar. Comm’n, 383 U.S. 607, 619-20, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966) (citation omitted).
Ho Respondents argue that the Secretary put forth no evidence to support the Commission’s finding that the building renovation was a business affecting interstate commerce. Because the Secretary failed to provide jurisdictional evidence, Ho Respondents contend none of them was subject to the OSH Act. Moreover, Ho Respondents charge the Secretary cannot rely on the Commission’s finding of fact because the Commission relied on an inapplicable Ninth Circuit per se rule, see Usery v. Lacy, 628 F.2d 1226, 1229 (9th Cir.1980) (extending OSH Act reach over employers in the construction industry whose “whose activities in the aggregate affect commerce”), and a nonpreclusive jurisdictional finding of this Court in the criminal action against Ho based on the “aggregate” effect on interstate commerce of asbestos removal violations under the CAA, see Ho, 311 F.3d at 603-04.
The Secretary responds that she provided evidence that Ho was engaged in a business affecting interstate commerce and was therefore subject to the OSH Act. The Secretary points out Ho had a majority interest in two interstate trucking firms (Ho Ho Ho Express being one). Alternatively, the Secretary argues Ho’s asbestos abatement activities at the hospital site constituted a business affecting interstate commerce. The Secretary notes this Court has previously held that Ho’s illicit asbestos operations at the hospital site, when aggregated, affected the interstate markets in asbestos removal services and commercial real estate in the context of Ho’s CAA criminal case. Id. The Secretary maintains Ho’s activities at the hospital were specifically found to affect interstate commerce substantially enough to support federal regulation; this issue cannot be relitigated. The Secretary also argues Ho misreads Austin Road to impose an evidentiary hurdle to defeat even normal application of collateral estoppel.
Even if this Court does not find jurisdiction based on collateral estoppel, the Secretary stresses she presented evidence showing that, by failing to comply with the OSH Act requirements, Ho gained a competitive advantage over licensed asbestos firms, including Alamo, and deprived them of a commercial business opportunity in the national market for asbestos removal. Moreover, the Secretary argues Ho’s illicit asbestos removal project also would increase asbestos removal costs for law-abiding commercial property owners.
This Court in Ho’s criminal appeal clearly indicated that his specific illicit construction activities concerning asbestos abatement, when considered in the aggregate, *363 directly affected interstate commerce in the national market of asbestos removal. Ho, 311 F.3d at 603-04. In finding that the challenged provisions of the CAA constitutionally reached Ho under the Commerce Clause, we stated that “a national market exists for asbestos removal services” and that “Ho’s activities would injure this market.” Id. at 603. We also stated that Ho’s illegal asbestos abatement activities in the aggregate “posed a threat to the interstate commercial real estate market” because they “would reduce the number of companies providing asbestos removal services” and “conscientious property owners would have more trouble locating licensed abatement companies and likely would have to pay higher prices.” Id. at 604.
Here, though we are informed by the aggregation principle’s application to asbestos removal activities outlined in Ho, as the Commission was also so informed, we do not rest the instant jurisdictional result based on collateral estoppel or issue preclusion from Ho’s criminal CAA case.[2] Nor do we have before us the constitutionality of any provision of the OSH Act or accompanying regulation. We also do not recognize the Ninth Circuit per se construction rule Ho Respondents insist was adopted by the Commission in its decision. Instead, pursuant to Austin Road, we consider whether the Commission’s factual finding that Ho’s illegal asbestos abatement activities at the hospital worksite affected interstate commerce was supported by substantial evidence in the record.
Despite Ho Respondents’ arguments, there is sufficient record evidence that Ho specifically deprived the asbestos removal firm Alamo of a legitimate commercial job to remove asbestos from the hospital site in accordance with the OSH Act. Ho negotiated with, but did not actually employ, Alamo to perform the licensed abatement. Instead, Ho hired illegal immigrants to remove the asbestos for $1000 each before he ever agreed to Alamo’s proposal. This evidence indicates in the context of the OSH Act, similar to what this Court has already analyzed in the context of the CAA, that Ho’s asbestos removal activities affected interstate commerce by depriving legitimate commercial asbestos abatement firms of the opportunity to perform the work at the site. Ho’s deliberate decision to have unlicensed workers perform the asbestos abatement project sidestepped, and thus supplanted, a commercial firm that operates within the legitimate national market for asbestos removal services, a licensed firm which adheres to OSH Act provisions and regulations. . We find ,Ho’s illegal asbestos activities sufficiently affected interstate commerce so as to be subject to the OSH Act. Unlike in Austin Road, here the essential fact that Ho’s abatement activities affected interstate commerce is not speculative and conclusionary, but rather is established in the record. See 683 F.2d at 908.
*364 The Secretary thus met her modest jurisdictional burden under the OSH Act. See id. at 907. Therefore, on this record, we find substantial evidence exists to support the Commission’s factual finding that Ho’s activities sufficiently affected interstate commerce to support the OSH Act’s jurisdictional reach over Ho as an employer per § 652(5).

Whether the Commission’s factual findings that Ho Ho Ho Express, Inc. and Houston Fruitland, Inc. were not alter egos of Ho to support reverse corporate piercing were supported by substantial evidence.

In the typical corporate veil piercing scenario, the corporate veil is pierced such that individual shareholders can be held liable for corporate acts. Maiz v. Virani, 311 F.3d 334, 346 n. 11 (5th Cir.2002). Here, the purpose of piercing the corporate veils of Ho Ho Ho Express, Inc. and Houston Fruitland, Inc. would be to hold the corporations liable for the acts of their individual shareholder, Ho. See id. Therefore, this case presents a “reverse corporate veil piercing” situation. Id. “This slight variation is of no consequence, however, because the end result under both views is the same — two separate entities merge into one for liability purposes.” Id. If alter ego is shown, courts reverse pierce the corporate veil to treat the individual and the corporation as “one and the same.” Zahra Spiritual Trust v. United States, 910 F.2d 240, 244 (5th Cir.1990) (citation omitted).
In Permian Petroleum Co. v. Petroleos Mexicanos, 934 F.2d 635 (5th Cir.1991), this Court considered whether a corporate form should be reverse pierced for purposes of a natural gas contract dispute. Id. at 643. There, we determined that an alter ego relationship for purposes of reverse veil piercing applies where “there is such unity between corporation and individual that the separateness of the corporation has ceased.” Id. (citation omitted). Factors involved in this test for an alter ego relationship include:
[T]he total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes.
Id. at 643 (citing Castleberry v. Branscum, 721 S.W.2d 270, 272 (Tex.1986)). In Century Hotels v. United States, 952 F.2d 107 (5th Cir.1992), we considered whether a family-held corporate form should be reverse pierced for the 26 U.S.C. § 7426 tax liability of an individual family member. Id. at 110-112. There, we indicated the reverse veil piercing alter ego analysis depends on the factfinder’s weighing of the totality of the circumstances. Id. at 110; see also Bridas S.A.P.I.C. v. Gov’t of Turkmenistan, 345 F.3d 347, 359-60 (5th Cir.2003) (finding legal error where district court failed to consider totality in parent-subsidiary alter ego case); United States v. Jon-T Chems., Inc., 768 F.2d 686, 694 n. 8, 696 (5th Cir.1985) (noting alter ego depends on totality in case where subsidiary company was found to be alter ego of parent company). As the Commission correctly noted, this Circuit has not determined the extent of reverse veil piercing via the alter ego theory in the context of remedial social legislation such as the OSH Act. However, as a logical application of Permian and Century Hotels, we agree with the Commission that reverse corporate veil piercing may apply in this context. *365 [3]
“The question of whether to pierce the corporate veil is primarily one of fact and therefore a very deferential standard of review applies.” Hollowell v. Orleans Regional Hosp. LLC, 217 F.3d 379, 385 (5th Cir.2000) (discussing piercing the corporate veil via alter ego theory) (citation omitted); see also Bridas, 345 F.3d at 359 (describing alter ego determination as “highly fact-based”). “In reviewing a decision by an administrative- agency, we accept all factual findings supported by substantial evidence in the record considered as a whole.” Austin Road, 683 F.2d at 908. We are thus bound by the Commission’s factual findings on alter ego if they are supported by substantial evidence in the record. MICA Corp. v. OSHRC, 295 F.3d 447, 449 (5th Cir.2002); See also 29 U.S.C. § 660(a) (1970) (stating such findings are conclusive).
The Secretary challenges the Commission’s finding that the corporate Ho Respondents were not suitable parties for liability under the OSH Act. The Secretary argues Ho used Ho Ho Ho Express and Houston Fruitland as mere business conduits for his illegal asbestos removal activities. The Secretary relies on the alter ego doctrine — that because Ho had control over the corporate Ho Respondents, the limited liability of the corporate form should be “reverse pierced” to hold the corporations liable for the debts of their controlling shareholder. See Century Hotels, 952 F.2d at 110-12; Permian, 934 F.2d at 643. The Secretary focuses on the high ownership shares of Ho in the corporations, approximately 67 percent; the commingling of funds between the corporations and Ho; and the fact that funding for the purchase of the hospital site and payment for the renovation supplies and wages came from the corporations.
Ho Respondents agree with the Commission’s findings that the corporate Ho Respondents were not the alter egos of Ho to support reverse piercing them for the purpose of imposing liability. Ho Respondents argue that substantial evidence supports the Commission’s factual findings that the corporate Ho Respondents did not engage in the asbestos removal activities at issue and were not the employers of the workers at the site. Also, Ho Respondents stress the Commission was correct in finding Ho’s corporations were legitimate operating entities on their own.
Ho Respondents concede that a Ho Ho Ho Express truck was parked once at the worksite, and Ho did engage in corporate borrowing between the entities. However, Ho Respondents stress that all the respective corporate accounts and ledgers were legitimately debited and credited for each borrowing transaction. Moreover, the corporate Ho Respondents did not provide any employees to the site. Ho Respondents thus contend the Commission correctly reviewed the totality of the facts to determine that there was no alter ego relationship here. See Jon-T Chems., 768 F.2d at 692. Ho Respondents maintain reverse piercing was not warranted because it is clear here that Ho and the corporate Ho Respondents could not be treated as “one and the same.” See Zahra, 910 F.2d at 243-44. Ho Respondents point out there is no evidence that the corporate Ho Respondents were operated in a manner indistinguishable from Ho’s personal affairs. .
*366 The Commission employed the proper legal standard for reverse corporate piercing based on alter ego because it considered the totality of the Permian factors in Ho’s case. See Bridas, 345 F.3d at 359-60 (finding legal error because the district court’s determination of no alter ego was based solely on corporate formalities). Thus, we determine whether the Commission’s factual findings that Houston Fruitland and Ho Ho Ho Express should not be considered as alter egos of Ho under that totality were supported by substantial evidence. After a thorough review of the record, we conclude that they were. The Secretary’s contention that Ho Ho Ho Express and Houston Fruitland were “nothing more than incorporated pocketbooks for Ho’s personal use” is unfounded. Although Ho clearly involved some of the corporate entities’ finances in his hospital project, the record evidence indicates that Ho as the individual in charge of this particular renovation project remained distinct from the corporate Ho Respondents as ongoing, formalized fruit sale and delivery entities.
While there is evidence that Ho played a role in the corporate Ho Respondents’ day-to-day operations, and Ho’s personal assistant employed by Ho Ho Ho Express ran some errands for Ho concerning the renovation project, Houston Fruitland and Ho Ho Ho Express still maintained entirely separate corporate identities, tax identities, bank accounts, and legitimate business operations. This is not a case such as Century Hotels where payment of a family shareholder’s personal expenses, funding of his son’s checking account, and ownership of the personal family residence could directly be traced back to the family companies. 952 F.2d at 111-12. There, “the patterns of dealing among the Smith family companies” distinctly showed “[use of] the corporate form for illegitimate ends.” Id. at 112. In contrast, the record evidence here indicates that the corporate Ho Respondents had a limited financial stake in Ho’s renovation project, not that they functioned as his alter egos on the renovation project.
Although Ho borrowed from the corporate Ho Respondents for financing of the hospital project, an admittedly personal pursuit, the record evidence indicates distinct debit ledger entries and some repayment to the corporations by Ho. This fact also distinguishes Ho’s case from Century Hotels. See 952 F.2d at 111 n. 12 (noting the lack of evidence of “loan” repayment). Moreover, there is no evidence that the corporate entities were ever treated or confused as one and the same with the individual Ho or his personal dealings. Admittedly, here, the alter ego question is not as readily resolved as in Century Hotels. However, to affirm the Commission’s findings on alter ego, this Court need only look for “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.” Consolo, 383 U.S. at 619-20, 86 S.Ct. 1018 (citation omitted).
We find substantial evidence in the record adequately supporting that the totality of the factors under the Permian alter ego test did not indicate “such unity between corporation^] and individual that the separateness of the corporation^] ha[d] ceased.” 934 F.2d at 643 (citation omitted). Therefore, this Court is bound by the Commission’s findings that Ho Ho Ho Express and Houston Fruitland were not alter egos of Ho to support reverse corporate piercing.

Whether the Commission’s legal conclusion that Ho did not willfully violate the general duty clause, § 654(a)(l), of the OSH Act, was arbitrary, capricious, an abuse of discretion, or not in accordance with law.

Section 654(a)(1) of the OSH Act requires employers to free their *367 workplaces of “recognized hazards that are causing or are likely to cause death or serious physical harm to ... employees.” 29 U.S.C. § 654(a)(1) (1970).[4] The specific general duty citation here arose from the explosion of natural gas released by tapping an unmarked valve. A willful violation is one committed voluntarily, with either intentional disregard of, or plain indifference to, OSH Act requirements. Georgia Elec. Co. v. Marshall, 595 F.2d 309, 318 (5th Cir.1979). ‘“Willful’ means action taken knowledgeably by one subject to the statutory provisions in disregard of the action’s legality.” Id. at 317 (quoting Intercounty Constr. Co. v. OSHRC, 522 F.2d 777, 779-80 (4th Cir.1975)). In contrast, “[t]he gravamen of a serious violation is the presence of a ‘substantial probability’ that a particular violation could result in death or serious physical harm.” Id. at 318. The employer’s intent to violate an OSH Act standard is irrelevant to find a serious violation'. Id. The Commission’s legal conclusions can only be set aside if they are arbitrary, capricious, an abuse of discretion, or not in accordance with law. MICA Corp., 295 F.3d at 449 (citation omitted).
The Secretary argues the Commission’s finding that Ho’s violation of § 654(a)(1) was not willful was based on an erroneous legal standard requiring direct evidence of Ho’s state of mind. The Secretary contends Ho demonstrated plain indifference in directing Tate to tap into the unmarked pipeline in an attempt to procure water for washing the building. ' According to the Secretary, this was a clear violation of the stop-work order Ho received in February. Therefore, the Secretary maintains Ho knew tapping into the pipeline without approval was illegal, even if he may not have known of the specific explosion hazard or that it was a violation of the general duty clause of the OSH Act. The Secretary argues direct evidence of Ho’s state of mind was not required because proof of Ho’s plain indifference to legal requirements in general was clearly established.
Ho Respondents reply that the Commission was correct to find that the Secretary had not met her burden of proof in showing Ho’s violation as rising to the intent of willful. Ho Respondents maintain the Commission applied the correct legal standard, and substantial evidence on the record supports its decision that the § 654(a)(1) violation was not willful. Ho respondents argue the Commission’s reference to direct evidence amounted to a recognition that the Secretary had not put forth any evidence relevant to the specific circumstances of the violation in question. Ho Respondents emphasize that the Secretary did not put forth any evidence of Ho’s state of mind to show that he had a heightened awareness that instructing Tate to open the valve might be hazardous or that Ho consciously disregarded a known safety hazard related to the valve — that is, for this action to meet a showing of either intentional disregard of the OSH Act or plain indifference to employee safety. Ho Respondents stress there was no evidence directed to the intent accompanying this particular incident.
The Secretary argues that Ho’s action here was part of a consistent illegal and voluntary course of conduct; all his actions were plainly indifferent to employee safety. However, although there may be evi *368 dence of a conscious pattern of illegal work practices by Ho with regard to the asbestos abatement, the challenged violation of the general duty clause does not concern Ho’s many asbestos transgressions covered specifically by OSH Act regulations. See Reich v. Arcadian Corp., 110 F.3d 1192, 1196 (5th Cir.1997). In particular, it related to an employee being required to open a pipe of unknown content. Here, the Secretary presented no evidence relevant to Ho’s state of mind on, or recognition of the hazards of, this particular action to direct Tate to open the unmarked valve. We thus agree with the Commission that plain indifference as to this specific hazardous action cannot be inferred, even from Ho’s several OSH Act violations concerning the asbestos removal project.
Though the evidence need not indicate “bad purpose” or “evil motive” to commit a particular act, Georgia Elec. Co., 595 F.2d at 319 n. 23, there must be evidence of that “extra ingredient needed for willfulness, either the element of intentional disregard or plain indifference.” Id. at 318 n. 22 (internal quotation marks omitted). None existed in this record. Though Ho’s pattern of illegal work practices may have been conscious, and his asbestos-related OSH Act violations found to be willful, this does not compel a finding of willfulness as to his specific instruction to open the unmarked valve. See id. Therefore, because the Commission’s legal determination as to Ho’s lack of willfulness under § 654(a)(1) was neither arbitrary, capricious, nor an abuse of discretion, and accords with law, we accept its conclusion.

Whether the citations against Ho should have been assessed on a per-employee or per-instance basis.

The Secretary’s discretion to cite multiple violations of an OSH Act standard is restricted “to those standards which are capable of such interpretation.” Sec. of Labor v. The Hartford Roofing Co., Inc., 1995 WL 555498, at *6 (O.S.H.R.C.). “The test of whether the [OSH] Act and the cited regulation permits multiple or single units of prosecution is whether they prohibit individual acts, or a single course of action.” Sec. of Labor v. Caterpillar, Inc., 1993 WL 44416, at *22 (O.S.H.R.C.) (citation omitted). “With few exceptions, the Commission has not affirmed multiple violations for violations of the same standard, or affirmed separate violations or penalties on a per employee exposed basis.” Id. at *23. The Commission here determined that the plain language of the training and respirator subsections of the asbestos standard at issue prescribed a single work practice instead of conduct unique and specific to each employee. It thus only affirmed one training and one respirator citation against Ho.
The Secretary argues the per-employee citations for asbestos training and respirator violations, with which she charged Ho Respondents, should have been affirmed by the Commission. The Secretary maintains that each time an employer commits a prohibited act or allows a prohibited condition to exist, the employer violates the OSH Act. The Secretary contends the Commission’s analysis ignores the standards’ plain language and the established test for determining which conditions or actions constitute separate violations under the OSH Act, as enunciated in the Commission’s own prior cases and in this Court’s caselaw. The Secretary insists the Commission also ignored basic precepts of prosecutorial discretion.
The Secretary argues that if a standard prohibits individual acts or conditions, the standard is violated each time the prohibited act or condition occurs. See Sec. of Labor v. Andrew Catapano Enters., Inc., 1996 WL 559899, at *9-10 (finding each *369 location at site where shoring in trench to prevent cave-in was not installed was violation of 29 C.F.R. § 1926.652(b)); Sec. of Labor v. J.A. Jones Constr. Co., 1993 WL 61950, at *14 (O.S.H.R.C.) (finding each location at site lacking fall protection was violation of 29 C.F.R. § 1926.500); Caterpillar, 1993 WL 44416, at *22-*23 (finding each employer failure to record an employee’s injury or illness on its OSHA log was violation of 29 C.F.R. § 1904.2(a)); Sec. of Labor v. Hoffman Constr. Co., 1978 WL 6990, at *1 (O.S.H.R.C.) (finding each failure to erect a guardrail on scaffolding was violation of 29 C.F.R. § 1926.451(a)(4)).
The general construction training standard, 29 C.F.R. § 1926.21(b)(2),[5] which requires employers to “instruct each employee in the recognition and avoidance of unsafe conditions,” has been interpreted as being citable on a per-employee basis. Catapano, 1996 WL 559899, at *4-5. Portions of the lead standard have also been interpreted as permitting per-employee citations because the standard’s medical removal subsection, 29 C.F.R. § 1910.1025(k)(1)(i)(D),[6] and respirator fittest subsection, 29 C.F.R. § 1910.1025(f)(3)(ii),[7] required evaluation of individual employees. Sec. of Labor v. Sanders Lead Co., 1995 WL 242606, at *3, *6 (O.S.H.R.C.). But see Arcadian, 110 F.3d at 1196-99 (finding general duty clause of OSH Act directed at hazardous conditions did not allow per-employee citations but noting that worker training or removal standards could count each employee as the unit of violation); Hartford Roofing, 1995 WL 555498, at *6-7 (finding one unguarded roof edge requiring warning was single violation of 29 C.F.R. § 1926.500(g)(1)© and § 1926.500(g)(4) no matter how many employees were exposed to a fall but noting that the respirator protection standard, 29 C.F.R. § 1910.134, could count a separate violation as to each *370 employee not provided a respirator). Neither the Secretary nor Ho Respondents advance any Fifth Circuit or Commission precedent interpreting the asbestos standard.
As to training violations, the Secretary maintains that Ho violated § 1926.1101(k)(9)(i) and (viii)[8] of the asbestos regulations each time he assigned a worker to remove asbestos without providing the worker with individual training about the hazards of asbestos removal and about the required safeguards against those hazards. The Secretary bases this argument on the plain language of the regulation: employers are to conduct the training program “in a manner the employee is able to understand ... [so] that each such employee is informed.” 29 C.F.R. § 1926.1101(k)(9)(viii) (1997). According to the Secretary, this language requires tailoring the training to each individual employee’s characteristics and comprehension, not to mention language skills and hire date. The Secretary argues Arcadian, 110 F.3d at 1199, supports this reading of the regulation. Also, the Secretary notes Catapano reached a per-employee result with the analogous general construction training standard. 1996 WL 559899, at *4-5.
As to respirator violations, the Secretary points again to the plain language of § 1926.1101(h)(l)(i): “[t]he employer shall provide respirators, and ensure that they are used ... [d]uring all Class I asbestos jobs.” 29 C.F.R. § 1926.1101(h)(l)(i) (1997).[9] The Secretary notes that this standard goes on in later subsections to explain that each employee is to be provided an appropriate, approved, properly fitted respirator. See id. § 1926.1101(h)(2)(iii) (allowing employee to choose air-purifying versus negative-pressure respirator); id. § 1926.1101(h)(4)(i) and (ii) (mandating fit tests to ensure least possible faceplate leakage). As with the individualized training sessions, the Secretary argues each of Ho’s 11 employees required a personally fitted respirator that the employee had chosen. Thus, Ho was required to take employee-specific actions. Again, the Secretary cites Arcadian, 110 F.3d at 1199. The Secretary also relies on Sanders Lead, 1995 WL 242606, at *6, which discussed the lead respirator fit-testing standard. See also Hartford Roofing, 1995 WL 555498, at *7 (noting that the respirator protection standard could be counted as a separate violation for each employee not provided a respirator).
In addition, the Secretary maintains the Commission used a flawed analysis to in *371 terpret the training and respirator regulations. The Secretary argues a training program is meaningless unless implemented on an individual basis. Likewise, Ho was required to give each worker an individual respirator. This was not a single, discrete act, but rather required initial fitting and then periodic refitting for each worker. The Secretary suggests a nonsensical reading would ensue if an employer not providing any respirators, like Ho, resulted in only one violation, while an employer who provided them but did not fit-test them received per-employee citations.
Finally, the Secretary argues that even if the standards were ambiguous, the Secretary’s per-employee construction was reasonable and entitled to deference. That is, it sensibly conformed to the purpose and wording of the regulations. See Martin v. OSHRC, 499 U.S. 144, 150-51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). The Secretary contends the Commission incorrectly failed to defer to the reasonableness of the Secretary’s interpretation. The Commission claimed the Secretary failed to raise it, but the Secretary responds she was not so required because she was only defending Ho’s appeal of the ALJ’s decision. And the Secretary notes Ho raised no deference challenge. The Secretary argues the Commission could not choose its own interpretation of the regulatory language where hers was reasonable. See id. at 158, 111 S.Ct. 1171. The Secretary maintains the Commission also improperly concluded the Secretary’s decisions on this issue had not been consistent and that in any event Ho did not have fair notice that these standards could be assessed on a per-employee basis. Moreover, the Secretary contends Ho had to affirmatively plead and prove lack of fair notice, which claim he did not even raise.
Ho Respondents agree with the Commission’s treatment of the plain language of the respirator and training regulations. Ho Respondents argue the Secretary’s position that she can choose to issue- citations on - a -per-employee basis as opposed to a per-violation basis is not supported by the language of the standards. Ho Respondents contend such plain language cannot be expanded under the guise of interpretation. Ho Respondents stress the Commission properly vacated the 20 citations that were entirely duplicative, except as to the name of the worker involved. Ho Respondents rely on Arcadian, 110 F.3d at 1193-94, 1196, as prohibiting the very kind of per-employee citations and penalties the Secretary wants to impose on them. Ho Respondents argue the language in the OSH Act general duty clause at issue in Arcadian is substantially similar to that in the respirator and training regulations at issue here.
Ho Respondents contend it is violative employer conduct or a violative condition, as opposed to the number of employees, that is the proper unit of prosecution. Ho Respondents also argue the ■ Secretary’s position is not to be accorded deference because the regulations are unambiguous and thus applied not per employee, but rather per violation. Even if the language were ambiguous, Ho Respondents maintain the Secretary’s per-employee interpretation is not reasonable because the Secretary used a punitive citation here to publish her inconsistent interpretation of the standard. Ho Respondénts argue the Secretary’s per-employee citations are not in accordance with law because they were beyond the scope of her authority pursuant to the OSH Act and are not entitled to deference because they were neither consistent with the language of the, standards nor consistently applied.
*372 After reviewing the arguments advanced by the parties, we agree with the Commission’s result that the training and respirator citations cannot be imposed per employee here. As to the asbestos respirator standard, we fully agree with the Commission’s reasoning. However, as to the asbestos training standard, we affirm the Commission’s result for different reasoning.

Asbestos training standard, 29 C.F.R. § 1926.1101(h) (9) (i) and (viii).

To begin, we find this standard’s language ambiguous. Thus, unlike the Commission, which found the standard to be stated solely in inclusive terms, we agree with the Secretary that the language of the asbestos training standard allows the Secretary, in her discretion, to reasonably assess penalties on a per-employee basis.
Subpart (i) expressly refers to “a training program for all employees” performing Class I asbestos work and also speaks to the employer’s requirement to “ensure their participation in the program,” which language tends to indicate that one training program is to be provided for all employees as a unit and does not appear to make allowance for a per-employee assessment. 29 C.F.R. § 1926.1101(k)(9)(i) (1997). However, although subpart (viii) again refers to the singular “training program,” it also goes on to state that the program “shall be conducted in a manner the employee is able to understand” and that the employer “shall ensure that each such employee is informed of the following.” Id. § 1926.1101(k)(9)(viii).
These express references to the ability of the employee to understand and to “each such employee” being informed implicate the possibility that on an individual basis, employees may need distinct, discrete information not provided to “each such” other employee, perhaps due to differences in experience, language, and job skills. Although this Court has treated the reference to “each of his employees” in the general duty clause of the OSH Act to be entirely inclusive, this reading was made in the context of § 654(a)(1) being a “catchall provision” governing any recognized hazards of the workplace not covered by a specific regulation. Arcadian, 110 F.3d at 1196 (citation omitted). There is a distinction when reading the specific asbestos training regulation, which does not have a “principal focus on hazardous conditions” such that “each” is only used to clarify that the employer’s duty runs to all employees, “regardless of their individual susceptibilities (i.e., age or pregnancy).” Id. at 1198.
In contrast, subpart (viii) of the asbestos training standard instructs employers that the training program must be conducted in such a way that the employees understand and are informed of various asbestos-related hazards. See 29 C.F.R. § 1926.1101(k)(9)(viii) (1997). Whether an employee understands and is informed by a training program, as the regulation requires, may depend on his “individual susceptibilities.” See Arcadian, 110 F.3d at 1198. Thus, considering the interaction of the two subparts (i) and (viii) of the asbestos training standard together, we agree with the Secretary that § 1926.1101(k)(9) is ambiguous and therefore can be interpreted to allow for citation on a per-employee basis.
However, we find the Secretary’s discretionary decision to cite Ho on a per-employee basis on these facts was unreasonable. In Martin, the Supreme Court explained the division of powers between the Secretary and the Commission under the OSH Act. 499 U.S. at 157-58, 111 S.Ct. 1171. As a reviewing court, we “should defer to the Secretary only if the *373 Secretary’s interpretation, is reasonable.” Id. at 158, 111 S.Ct. 1171 (emphasis-in original). Thus, under Martin, after determining that a standard is ambiguous, we must perform an assessment of the reasonableness of the Secretary’s view to determine whether we must defer to it over the Commission’s competing interpretation in a particular case. Id. at 150, 159, 111 S.Ct. 1171. In this way, we are authorized by Congress to “protect regulated parties from biased interpretations of the Secretary’s regulations.” Id. at 156, 111 S.Ct. 1171. “The Secretary’s interpretation of an ambiguous standard is subject to the same standard of substantive review as any other exercise of delegated lawmaking power.” Id. at 158, 111 S.Ct. 1171 (citing 5 U.S.C. § 706(2)(A)). That is, the Secretary’s interpretation is not reasonable, and this Court can hold it unlawful and set it aside, if we find such interpretation to be “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A) (1996).
We note first that this case does not present any employee-specific unique circumstances that could merit citation based on each failure to train an individual employee. See, e.g., Catapano, 1996 WL 559899, at *5 (vacating duplicative training citations because of a lack of different circumstances). Here, the training citations merely tracked the language of sub-part (i), referring to Ho as employer not instituting “a training program for all employees,” and of subpart (viii), referring to Ho as employer not ensuring his employees were informed of the items listed in subpart (viii). There was no indication as to how one citation may have been distinct from the next. Moreover, as in Arcadian, all the cited violations were identical to each other, except for the name of the hospital site worker. See 110 F.3d at 1194; see also Catapano, 1996 WL 559899, at *5 (noting the citations were identical, except for the date). But see also Arcadian, 110 F.3d at 1198-99 (indicating in dictum that although “generally unavailable,” “[a]n employee could be a unit of violation” “if the regulated condition or practice is unique to the employee”).
Nothing in this record indicates that one training program regarding this Class I asbestos removal at the hospital site would not have abated the violation of both sub-parts (i) and (viii), nor that unique individual training sessions, or even more than one session, would have been necessary to abate the violation. The ALJ indicated that one training session, if all 11 workers had attended, would have been sufficient to meet the training standard here. The citations and evidence support that this was one Class I asbestos removal job on a single site at one address, performed by all the same 11 untrained workers, from the beginning to the end. Thus, although we acknowledge that there may be cases where per-employee citations ■ of § 1926.1101(k)(9) based on unique circumstances of the employees might be considered reasonable, here we do not defer to the Secretary’s unreasonable interpretation of the asbestos training regulation as applied to Ho. As the Commission’s interpretation of the standard here was reasonable as applied to Ho’s case, we affirm its assessment of one citation instead of 11 individual citations.

Asbestos respirator standard, 29 C.F.R. § 1926.1101(h) (l)(i).

Unlike the asbestos training standard, we read the plain language of the portion of the respirator standard for which Ho was cited as not allowing the Secretary the discretion to charge employers with per-employee citations. The regulation states: “The employer shall provide respirators, and ensure that they are used ... [djuring all Class I asbestos *374 jobs.” 29 C.F.R. § 1926.1101(h)(l)(i) (1997). The Secretary makes the seemingly logical argument that it makes little sense for a malicious employer who provides no respirators at all to be eligible for fewer violations than an employer who in good faith provides respirators but fails to comply with other subparts of the asbestos respirator standard governing the employee’s ability to choose his type of respirator and periodic fit-testing requirements. However, there is simply no language in the general respiratory protection section that suggests the unit of prosecution could be based on each individual employee not receiving a respirator versus the employer’s course of action in failing to provide respirators to his employees as a whole for the Class I asbestos job. Instead, we read the unit of prosecution for violating this standard as applying per Class I asbestos job. See Hartford Roofing, 1995 WL 555498, at *5 (“[Wjhere a single practice, method or condition affects multiple employees, there can only be one violation of the standard.”). Here, the evidence indicates that Ho engaged in one Class I asbestos removal job at one hospital site for one sustained period of time.
In contrast, language in other parts of the asbestos respirator standard suggests citation on a per-employee basis might be appropriate. Subsection (h)(2)(iii) of the asbestos respirator standard contains language directing employers to provide an air-purifying respirator instead of a negative-pressure respirator to employees, but only when “[a]n employee chooses to use this type of respirator.” 29 C.F.R. § 1926.1101(h)(2)(iii)(A)(l).[10] A violation could be counted each time the employer did not provide the chosen type of respirator to the individual employee who requested it. Likewise, subsection (h)(4)(i) mandates the employer to “ensure that the respirator issued to the employee exhibits the least possible faceplate leakage and that the respirator is fitted properly.” Id. § 1926.1101(h)(4)(i).[11] This language properly applies to the unique circumstances of an individual employee; a violation could be counted as to each employee whose faceplate exhibited more than the least possible leakage and was not properly fitted at the time of issuance. Violations of subsection (h)(4)(h) mandating qualitative or quantitative fit-tests to be performed at the initial fitting and every six months afterward also could be appropriately assessed for each employee who did not receive such periodic testing.[12] Indeed, an *375 employer potentially could be cited multiple times per employee under subpart (ii) if multiple semiannual periods passed without the required fit-testing. Thus, while the latter subsections of the asbestos respirator standard require employee-specific action by the employer, none of the above employee-specific language is implicated in subsection (h)(l)(i) governing general provision of respirators to Class I asbestos workers. This general subsection plainly addresses employees in the aggregate.
While we agree with the Secretary that in dicta in Arcadian we stated that per-employee citation may be appropriate in certain cases “only if the regulated condition or practice was unique to the individual,” 110 F.3d at 1198-99, again, the precise issue there was neither the asbestos respirator standard nor any respirator standard at all. As for the Secretary’s reliance on Sanders Lead, there the Commission interpreted not the section of the lead respirator standard governing general provision of respirators to employees, see 29 C.F.R. § 1910.1025(f)(1),[13] but rather the fit-testing subsection, 29 C.F.R. § 1910.1025(f)(3)(ii).[14] 1995 WL 242606, at *6. “[T]he respirator fit-test standard requires the evaluation of individual employees’ respirators under certain unique circumstances peculiar to each employee.” Id. As we indicated above, the fit-test portion of the asbestos respirator standard similarly provides for per-employee assessment of violations. See 29 C.F.R. § 1926.1101(h)(4)(ii). Finally, in Hartford Roofing,' although the Commission indicated there may be per-employee assessment of violations of the respiratory protection standard, 29 C.F.R. § 1910.134, such statement was made in dicta, as the precise issue was whether the Secretary could cite a separate violation of 29 C.F.R. § 1926.500(g)(1)[15] and § 1926.500(g)(4)[16] *376 for each employee exposed to an unguarded roof edge. 1995 WL 555498, at *6-7, *10 (affirming the ALJ’s assessment of one citation where the Secretary had issued one for each of six employees). Moreover, the respiratory standard mentioned in Hartford Roofing related not to asbestos or lead, but rather to general industry, shipyards, marine terminals, longshoring, and construction. See 29 C.F.R. § 1910.134 (1992). In those work zones, widespread use of respirators is not required, but rather depends on the precise atmospheric conditions, when it becomes necessary to protect the employees’ health. See id.
After considering the plain language of subsection (h)(l)(i) of the asbestos respirator standard, we agree with the Commission and find that the regulation does not provide for the assessment of citations on a per-employee basis, but rather on the basis of an employer’s course of conduct in failing to provide respirators to his employees during a Class I asbestos job. Thus, Ho’s failure to provide respirators to all 11 workers at the hospital site for the single Class I asbestos removal project was a single violation of the respirator regulation. Therefore, we affirm the Commission’s assessment of one violation of § 1926.1101(h)(l)(i).[17]

Whether the Commission abused its discretion in imposing the maximum penalties for Ho’s OSH Act violations.

The Commission has the exclusive authority to assess penalties once a proposed penalty is contested. Arcadian, 110 F.3d at 1199. Section 17(j) of the OSH Act, 29 U.S.C. § 666(j), guides the Commission’s assessment of a penalty. Id.; J.A. Jones, 1993 WL 61950, at *15. The Commission is to “giv[e] due consideration to the appropriateness of the penalty with respect to [1] the size of the business of the employer being charged, [2] the gravity of the violation, [3] the good faith of the employer, and [4] the history of previous violations.” 29 U.S.C. § 666(j) (1990). “These factors are not necessarily accorded equal weight....” J.A. Jones, 1993 WL 61950, at *15. Gravity of violation is the key factor. See id. The Commission can, when appropriate, consider the number of employees exposed to the condition when analyzing gravity. Arcadian, 110 F.3d at 1199. This Court reviews the Commission’s determination of the amount of an OSH Act penalty for abuse of discretion. Shaw Constr., Inc. v. OSHRC, 534 F.2d 1183, 1185 (5th Cir.1976).
Ho Respondents argue that the Commission abused its discretion in failing to consider each of the four elements set forth in § 666© in its determination of the amounts of penalties to assess. Ho Respondents maintain it was an abuse of discretion to consider Ho’s bad faith alone because all four factors are equally important.
The Secretary responds that the Commission did not err in assessing the maximum penalty for the two violations of the asbestos training and respirator standards it affirmed. The Secretary argues the Commission gave proper consideration to the statutory penalty criteria but concluded that Ho’s extreme and appalling disregard for employee safety — his lack of good faith — outweighed other considerations in the context of this case.
*377 After vacating 20 of the 22 asbestos training and respirator standard citations, the Commission' increased the remaining willful penalties to the maximum $70,000 each and the serious penalties to the maximum $7000 each to make a strong statement about Ho’s illegal behavior. To be sure, the Commission rested much of its decision on Ho’s lack of good faith. The Commission also, however, addressed the gravity of Ho’s violations; it considered the number of employees he exposed to the cited conditions to be a significant indication of gravity. While this inquiry is a factor-based balancing test, there is no requirement of equal consideration of all factors. See J.A. Jones, 1993 WL 61950, at *15. The Commission expressly considered and weighed Ho’s lack of good faith and the gravity of the violations. Based on the circumstances present in Ho’s particular case, we find the Commission did not abuse its discretion in ■ assessing the maximum penalty amounts.
CONCLUSION
Having carefully considered the record of the case and the parties’ respective briefing and arguments, for the reasons set forth above, we AFFIRM the Commission’s decision.
AFFIRMED.

. Although the Commission determined the corporate Ho Respondents were not liable under both the "alter ego” and "sham to perpetuate a fraud” theories, the Secretary did not brief any argument based on the "sham” doctrine. Thus, we do not address it.

. It would not be prudent to do so because even if Ho Respondents had presented any constitutional challenge to the specific OSH Act and implementing regulations at issue here, these provisions are entirely different from the Clean Air Act ("CAA”) provisions challenged in the prior criminal litigation. Thus, the issue at stake here would not be "the precise constitutional claim” involved in the prior litigation. See Montana v. United States, 440 U.S. 147, 156-57, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (finding tax provision of Montana's Revenue Code was constitutional under the Supremacy Clause via collateral estoppel where identical provision had previously been found to pass muster). Moreover, we specifically stressed that the holding in Ho was limited to that CAA criminal case. United States v. Ho, 311 F.3d 589, 594 (5th Cir.2002).

. We provide no discussion of whether state or federal alter ego law applies in this administrative case not arising under diversity jurisdiction. See Century Hotels v. United States, 952 F.2d 107, 110 n. 4 (5th Cir.1992) (noting "state and federal alter ego tests are essentially the same" and we “apply state and federal cases interchangeably”).

. The general duty clause of the OSH Act provides, in part:
(a) Each employer- — •
(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees ....
29 U.S.C. § 654(a)(1) (1970).

. Section 1926.21, Safety training and education, provides, in part:
(b) Employer responsibility.
(2) The employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury.
29 C.F.R. § 1926.21(b)(2) (1989),

. Section 1910.1025, Lead, provides, in part:
(k) Medical Removal Protection.
(l) Temporary medical removal and return of an employee.
(i) Temporary removal due to elevated blood lead levels.
(D) Fifth year of the standard, and thereafter. Beginning with the fifth year following the effective date of the standard, the employer shall remove an employee from work having an exposure to lead at or above the action level on each occasion that the average of the last three blood sampling tests conducted pursuant to this section (or the average of all blood sampling tests conducted over the previous six (6) months, whichever is longer) indicates that the employee's blood lead level is at or above 50 micrograms per 100 g of whole blood; provided, however, that an employee need not be removed if the last blood sampling test indicates a blood lead level at or below 40 micrograms per 100 g of whole blood.
29 C.F.R. § 1910.1025(k)(l)(i)(D) (1986).

. Section 1910.1025, Lead, provides, in part:
(f) Respiratory protection.
(3) Respirator usage.
(ii) Employers shall perform either quantitative or qualitative face fit tests at the time of initial fitting and at least every six months thereafter for each employee wearing negative pressure respirators. The qualitative fit tests may be used only for testing the fit of half-mask respirators where they are permitted to be worn, and shall be conducted in accordance with Appendix D. The tests shall be used to select facepieces that provide the required protection as prescribed in table II.
29 C.F.R. § 1910.1025(f)(3)(h) (1986).

. Section 1926.1101, Asbestos, provides, in part:
(k) Communication of hazards.
(9) Employee Information and Training.
(i) The employer shall, at no cost to the employee, institute a training program for all employees who are likely to be exposed in excess of a PEL and for all employees who perform Class I through IV asbestos operations, and shall ensure their participation in the program.
(viii) The training program shall be conducted in a manner that the employee is able to understand. In addition to the content required by provisions in paragraphs (k)(9)(iii) through (vi) of this section, the employer shall ensure that each such employee is informed of the following:
29 C.F.R. § 1926.1101 (k)(9)(i) and (viii) (1997).

. Section 1926.1101, Asbestos, provides, in part:
(h) Respiratory protection.
(l) General. The employer shall provide respirators, and ensure that they are used, where required by this section. Respirators shall be used in the following circumstances:
(i) During all Class I asbestos jobs.
29 C.F.R. § 1926.1101(h)(l)(i) (1997).

. Section 1926.1101, Asbestos, provides, in part:
(h) Respiratory protection.
(2) Respirator selection.
(iii)(A) The employer shall provide a tight fitting powered, air-purifying respirator in lieu of any negative-pressure respirator specified in Table 1 whenever:
(1) An employee chooses to use this type of respirator....
29 C.F.R. § 1926.1101 (h)(2)(iii)(A)(1) (1997).

. Section 1926.1101, Asbestos, provides, in part:
(h) Respiratory protection.
(4) Respirator fit testing.
(i) The employer shall ensure that the respirator issued to the employee exhibits the least possible facepiece leakage and that the respirator is fitted properly.
29 C.F.R. § 1926.1101 (h)(4)(i) (1997).

. Section 1926.1101, Asbestos, provides, in part:
(h) Respiratory protection.
(4) Respirator fit testing.
(ii) Employers shall perform either quantitative or qualitative face fit tests at the time of initial fitting and at least every 6 months thereafter for each employee wearing a negative-pressure respirator. The qualitative fit tests may be used only for testing the fit of half-mask respirators where they are per- *375 mittedto be worn, or of full-facepiece air purifying respirators where they are worn at levels at which half-facepiece air purifying respirators are permitted. Qualitative and quantitative fit tests shall be conducted in accordance with Appendix C to this section. The tests shall be used to select facep-ieces that provide the required protection as prescribed in Table 1 in paragraph (h)(2)(i) of this section.
29 C.F.R. § 1926.1101 (h)(4)(ii) (1997).

. Section 1910.1025, Lead, provides, in part:
(f) Respiratory protection.
(1) General. Where the use of respirators is required under this section, the employer shall provide, at no cost to the employee, and assure the use of respirators which comply with the requirements of this paragraph. Respirators shall be used in the following circumstances....
29 C.F.R. § 1910.1025(f)(1) (1986).

. See n.7.

. Section 1926.500, Guardrails, handrails, and covers, provides, in part:
(g) Guarding of low-pitched roof perimeters during the performance of built-up roofing work.
(1) General provisions. During the performance of built-up roofing work on. low-pitched roofs with a ground to eave height greater than 16 feet (4.9 meters), employees engaged in such work shall be protected from falling from all unprotected sides and edges of the roof as follows:
(i) By the use of a motion-stopping-safety system (MSS system)....
29 C.F.R. § 1926.500(g)(l)(i) (1992).

. Section 1926.500, Guardrails, handrails, and covers, provides, in part:
(g) Guarding of low-pitched roof perimeters during the performance of built-up roofing work!
(4) Mechanical equipment. Mechanical equipment may be used or stored only in areas where employees are being protected by either a warning line or an MSS system. Mechanical equipment may not be used or stored between the warning line and the roof edge unless the employees are being protected by an MSS system. Mechanical equipment may not be used or stored where the only protection provided is by a safety monitoring system.
*376 29 C.F.R. § 1926.500(g)(4) (1992).

. We pause to note that the instant result does not foreclose the possibility of a different result if an employer refuses to provide respirators to his employees for multiple and distinct Class I asbestos jobs; then each of those violations could be separately cited by the Secretary.